UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAHIN DANESHVAR and SHADI DEVELOPMENT, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>REX OLIVER, TBG VISIONS INC., WILLIAM G. HICKS, ESQ., WILLIAM G. HICKS, P.A., LAURA SPEDALE, ESQ. a/k/a LAURA M. RYS, ESQ., CITTA STRATEGY GROUP, LLC, CITTA INVESTMENT, LLC, RONALD I. GROSS, and RAM GLOBAL ENTERPRISES, LLC,<br><br>Defendants. | 25-CV-5578 (RA)<br><br>OPINION & ORDER |

RONNIE ABRAMS, United States District Judge:

Plaintiffs Shahin Daneshvar and Shadi Development, LLC ("SD"), bring this action against Defendants Rex Oliver and TBG Visions Inc. (collectively "Oliver/TBG"), William G. Hicks, Esq. and William Hicks, P.A. (collectively the "Hicks Defendants"), Laura Spedale, Esq. a/k/a Laura M. Rys, Esq. ("Spedale"), Citta Strategy Group, LLC ("CSG") and Citta Investment, LLC (collectively the "Citta Defendants"), and Ronald I. Gross and RAM Global Enterprises, LLC (collectively the "RAM Defendants"), alleging participation in a scheme to defraud them under the guise of financing the development of an affordable housing complex in the Bronx. Specifically, they allege violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), common law fraud, civil conspiracy to commit fraud, aiding and abetting fraud, negligent misrepresentation, common law conversion, civil conspiracy to commit conversion, aiding and abetting conversion, common law breach of fiduciary duty, common law

breach of contract, legal malpractice, and unjust enrichment against some or all Defendants. The RAM Defendants now move to compel arbitration of the claims brought against them on the basis of an arbitration clause in an agreement they entered into with Plaintiffs, to stay the matter pending the outcome of the arbitration, or alternatively, to transfer the claims against them to the District of Arizona pursuant to 28 U.S.C. § 1404. Plaintiffs oppose the motion, arguing that they are not bound to arbitrate, and along with the Hicks Defendants, oppose the motion to the extent it seeks to stay the entire action pending arbitration. Defendants Oliver/TBG and the Citta Defendants have, to date, failed to enter an appearance or otherwise respond to the Complaint. Additionally, Plaintiffs obtained a certificate of default as to Spedale, but have not otherwise moved for default judgment against her or any other Defendants who have failed to appear.

For the following reasons, the Court grants the motion to compel arbitration and stays the action pending its resolution. It further denies the motion to transfer without prejudice. Finally, it declines to address Spedale's default at this time.

**BACKGROUND**

The following facts are drawn from the parties' submissions and, unless disputed, are presumed true for the purposes of resolving the motion to compel arbitration. *Melendez v. Ethical Culture Fieldston Sch.*, 789 F. Supp. 3d 316, 322 n.1 (S.D.N.Y. 2025). This action centers on two allegedly fraudulent schemes perpetrated by Defendants: one concerning Defendants' promise to raise capital for a real estate development project financed by Plaintiffs, and the second concerning Defendants' pitch to Plaintiffs to get them to participate in a high-return investment involving the monetization of Standby Letters of Credit ("SLBC") obtained from foreign banks. *See* Dkt. No. 3 ("Compl.") ¶ 1. Plaintiffs allege that through the schemes, Defendants defrauded them out of millions of dollars.

## I. The Alleged Schemes

### A. EB-5 Investment Scheme

Plaintiffs, owners of a development property, sought to develop an affordable housing complex on their lot in the Bronx (the "Bronx Project"). *Id.* ¶¶ 15, 38. The receipt of a multi-million-dollar tax abatement for that property was conditioned on construction commencing within a short window of time. *Id.* ¶ 38. In 2023, Daneshvar began attempting to secure financing for the project and, in particular, pursued funding through the EB-5 Immigration Investor Pilot Program (the "EB-5 Program")—a federal program that incentivizes foreign investment with the promise of obtaining permanent resident status for investors. *Id.* ¶ 43. To facilitate the application process, Daneshvar retained Spedale, an attorney, and her companies, the Citta Defendants. *Id.* ¶¶ 43–44. Spedale, in turn, introduced Daneshvar to Gross, the owner of RAM, a "financial consultancy" firm claiming to specialize in assisting developers hoping to secure EB-5 financing. *Id.* ¶ 48.

On June 15th of that same year, Plaintiffs entered into an agreement with the RAM Defendants which serves as the source of the dispute now before the Court: the "Engagement/Mutual Non-Disclosure Non-Circumvention Agreement." *Id.* ¶ 66; *id.*, Ex. 5 (the "RAM Engagement Agreement" or the "Agreement"). The Agreement outlined the parties' financial obligations to each other and contained the arbitration clause that the RAM Defendants now seek to enforce. Compl. ¶¶ 67–74; RAM Engagement Agreement ¶ 11. At Gross's urging, Plaintiffs also retained the Hicks Firm as their counsel on the project, a relationship that was memorialized in the RAM Engagement Agreement, but to which the Hicks Defendants are not a party.

### B. SLBC Investment Scheme

Around the same time, Defendants allegedly solicited Plaintiffs to participate in another investment scheme to raise capital for the Bronx Project, this time with the assistance and

purported expertise of Oliver and his company, TBG. *Id.* ¶¶ 90–91. Plaintiffs claim that Spedale and Gross told them it would require an upfront investment of $2.75 million, which would be pooled with other investment funds and used to purchase an SBLC that would be traded by third parties. *Id.* ¶¶ 92–93. In return, Plaintiffs were promised a 100% return on their investment each month for ten months, amounting to a total of $27.5 million. *Id.* ¶ 96. The Hicks Defendants were supposed to manage the dividends from the SBLC investments, splitting the proceeds between Plaintiffs and the RAM Defendants, with Spedale also set to take a cut. *Id.* ¶¶ 96–98.

**C. Alleged Misconduct**

Plaintiffs contend that both opportunities quickly began to unravel. They maintain that Defendants were engaged in a web of conflicts of interest, and repeatedly misrepresented the status of the project and the extent of their efforts to secure EB-5 financing and deliver the return on the SBLC investment. *Id.* ¶¶ 80–111. Increasingly concerned, Plaintiffs repeatedly reached out to Defendants to obtain updates and express their worries, only to be reassured time and again that they would receive the money shortly—though it would never arrive. *Id.* ¶¶ 146–92. They now allege that Defendants had no intention of making true on any of their promises and instead, had planned to defraud them out of over $3,000,000.

**II. Procedural History**

On July 8, 2025, Plaintiffs commenced this action. As to all Defendants, they allege: violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; violations of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2); common law fraud; civil conspiracy to commit fraud; aiding and abetting fraud; common law conversion; civil conspiracy to commit conversion; aiding and abetting conversion; common law breach of fiduciary duty; and unjust enrichment. As to Oliver/TBG, the Citta Defendants, and the Hicks Defendants, they allege negligent misrepresentation. As to Oliver/TBG, they allege

common law breach of contract regarding the SBLC Investment Contract. As to the RAM Defendants and the Hicks Defendants, they allege common law breach of contract regarding the RAM Engagement Contract. And as to Spedale and the Citta Defendants, they allege breach of contract regarding another agreement. Finally, as to the Citta Defendants and the Hicks Defendants, they allege legal malpractice and negligence.

Oliver/TBG and the Citta Defendants have not filed a notice of appearance or otherwise responded. The Hicks Defendants filed an answer to the Complaint and the RAM Defendants filed a motion to compel arbitration, to stay the matter, or, alternatively, to transfer it to the District of Arizona in accordance with a forum selection clause in the RAM Engagement Agreement. Plaintiffs sought a clerk's certificate of default as to the Citta Defendants and Spedale, but obtained one only for Spedale. They have not moved for default judgment against either. Now before the Court is the RAM Defendants' motion to compel arbitration. For the reasons that follow, the motion is granted and the matter is stayed pending the outcome of that arbitration.

## LEGAL STANDARD

"When a contract contains a written arbitration clause and concerns a transaction involving commerce, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 . . . governs." *In re Currency Conversion Fee Antitrust Litig.,* 265 F. Supp. 2d 385, 400 (S.D.N.Y. 2003). The FAA "embodies a national policy favoring arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016).[1] However, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297; *accord Nicosia*, 834 F.3d at 229 ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). The court considers two factors when

[1] Unless otherwise indicated, quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

deciding if a dispute is arbitrable: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015). The threshold question of whether the parties agreed to arbitrate is a matter of contract, determined by state law. *Doe # 1 v. College Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020). The issue of an arbitration agreement's scope, however, "is governed by the federal substantive law of arbitrability." *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 633 F. Supp. 2d 109, 114 (S.D.N.Y. 2009).

In determining arbitrability, courts apply the summary judgment standard, *see Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003), and "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," drawing all reasonable inferences in favor of the non-moving party. *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011). Once the district court is satisfied that the parties have agreed to arbitrate the issues underlying the proceeding, the action must be stayed. *See Doe # 1*, 440 F. Supp. 3d at 355.

## DISCUSSION

### I. Arbitrability

#### A. Arbitration Agreement

The first question before the Court is whether the RAM Engagement Agreement's arbitration clause requires Plaintiffs to arbitrate the claims brought against the RAM Defendants. In other words, the Court asks whether the parties entered into a valid arbitration agreement, and, if so, whether the dispute at issue falls within the scope of the agreement. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). For the reasons that follow, the Court concludes that the arbitration agreement is valid and the dispute before it is arbitrable.

Among the many contracts the parties entered into regarding the financing of the Bronx Project, only the RAM Engagement Agreement is relevant to the current motion. The Agreement was signed by Gross as the managing member of RAM and Daneshvar as the managing member of SD and there is no dispute that it governed their relationship. In urging arbitration, the RAM Defendants rely on an arbitration clause in paragraph 11, which reads in full:

> **Injunctive Relief.** All matters arising out of or relating in any way whatsoever to this agreement, solely, shall be finally resolved by means of binding arbitration in accordance with the American Arbitration Association rules, whether in contract, tort, or otherwise shall be governed by the laws of the State of Arizona and the Federal Laws of the United States of America without regard to principles of conflict of law including its choice of law's provisions. Arbitration shall be held in the City of Phoenix, Maricopa County. A mediator shall be appointed by agreement between the parties. Parties agree to adhere to the ruling set forth by the American Arbitration Associate [sic] and agree to forego litigation in favor of their rulings. The prevailing party in such Arbitration, as shall be determined by the Arbitrator shall be entitled to an award it's [sic] reasonable legal fees and costs.

Compl., Ex. 5 ¶ 11 ("RAM Engagement Agreement").

**B. Choice of Law**

"Both federal and state law apply to arbitration clauses." *Eatoni Ergonomics*, 633 F. Supp. 2d at 114. The FAA "creates a body of federal substantive law of arbitrability applicable to arbitration agreements." *Id.* (citing *All. Bernstein Inv. Rsch. & Mgmt. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006)). However, "because an agreement to arbitrate is a creature of contract . . . the ultimate question of whether the parties agreed to arbitrate is determined by state law." *Id.* Here, there is no dispute that the parties agreed for the contract to be governed by Arizona law. *See* RAM Engagement Agreement. Accordingly, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The question of whether a given dispute is within the arbitration agreement's scope, however, is governed by the

"federal substantive law of arbitrability." *Progressive Cas. Ins. Co. v. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir. 1993). The Court thus applies Arizona state law to questions of validity and Second Circuit law to questions of scope.

**C. Validity and Enforceability of the Arbitration Agreement**

To form a valid contract under Arizona law, there "must be an offer, acceptance, [and] consideration." *Hayford v. Santander Consumer USA Incorp.*, 2021 WL 3934328, at *3 (D. Ariz. Aug. 11, 2021) (citing *Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991)). Each of these elements is present with respect to the RAM Engagement Agreement, and neither party disputes that they were bound by the Agreement as a whole. Nonetheless, Plaintiffs challenge the enforceability of the arbitration clause, arguing that its title, "Injunctive Relief," is sufficiently misleading so to render the agreement unconscionable and their assent to it invalid. Dkt. No. 46 ("Pls.' Opp'n") at 11–12. The Court disagrees and finds the provision enforceable.

To be sure, it is clear that the arbitration clause's header, "Injunctive Relief," is erroneous. The question is thus whether this error made the provision sufficiently inconspicuous so as to render it unenforceable. Under Arizona law, in the context of statutory interpretation, "titles and headings are but tools available for the resolution of a doubt; they cannot undo or limit that which the text makes plain." *Thommi v. Fisher*, 2018 WL 5306682, at *2 (Ariz. Ct. App. Oct. 25, 2018). So too in contract law. A provision is not procedurally unconscionable simply because it contains an inaccurate header. Rather, "procedural unconscionability targets unfair surprise, fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Monsanto v. DWW Partners, LLLP*, 2010 WL 234952, at *3 (D. Ariz. Jan. 15, 2010). The Court is guided by the indicia of unconscionability enumerated above, but also by "factors such . . . as age, education, intelligence, business acumen and experience, relative

bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." *Shivkov v. Artex Risk Sols. Incorp.*, 2019 WL 8806260, at *5 (D. Ariz. Aug. 5, 2019).

Despite the mislabeling of the arbitration clause, the substance of the provision is clear and conspicuous. The clause is "in the regular text of [a] relatively short contract . . . and written in the same font and spacing as every other portion." *Id.* The contract is concise—a mere five single spaced pages with twenty terms. *Id.* Moreover, Daneshvar initialed each page of the agreement, including the page where the arbitration provision appears. Plaintiffs' arguments urging the Court to find the arbitration clause unconscionable rest primarily on cases regarding adhesion contracts or "clickwrap" agreements, Pls.' Opp'n at 11, which present a contract on a "take-it-or-leave-it-basis," frequently leading unwitting consumers to agree to fine-print terms that they did not actually consent to or understand. *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 840 P.2d 1013, 1016 (1992). But these cases are inapposite. The arbitration agreement at the center of this dispute is a customized document governing a multi-million-dollar business transaction between corporate entities, reflecting the type of negotiated relationship expected among commercial entities like the parties here.

The Court's conclusion that the mislabeling did not render the arbitration clause inconspicuous or otherwise unconscionable is further supported by Plaintiffs' sophistication. Like the plaintiffs in *Shivkov v. Artex Risk Solutions Incorporated*, Plaintiffs here are "sophisticated people and businesses capable of negotiating this type of commercial relationship." 2019 WL 8806260, at *5. They own a real estate development company that was negotiating a $27 million tax abatement for a major affordable housing project in New York City before their involvement

with the RAM Defendants. This was not a contract imposed on an unwary consumer, but a negotiated commercial agreement between business entities. See *Gen. Elec. Co.*, 2004 WL 253320, at *4. Thus, notwithstanding its drafting imperfections, the RAM Engagement Agreement contains a valid and enforceable arbitration provision.

**D. Scope of Arbitration Agreement**

Having found the arbitration agreement valid, the Court turns to whether its scope is broad enough to cover the instant dispute, and finds that it is. "To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court must first determine whether the arbitration clause is broad or narrow." *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *15 (S.D.N.Y. Sept. 16, 2020). "A provision requiring arbitration of 'all' disputes between contracting parties generally is broad in scope." *Jamieson v. Secs. Am., Inc.*, 2019 WL 6977126, at *6 (S.D.N.Y. Dec. 20, 2019). "Where a provision to arbitrate is broad, its coverage extends to collateral matters beyond the interpretation and particular provisions of the contract containing the arbitration clause. Indeed, if the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them." *Id.*

Plaintiffs do not raise any arguments about the scope of the Agreement itself. Nor could they since the provision encompasses "all matters arising out of or relating in any way to this agreement." *See* RAM Engagement Agreement ¶ 11. Instead, they unconvincingly relitigate their enforceability argument—arguing that the mislabeling of the provision as "Injunctive Relief," cabins the Agreement's scope to claims seeking injunctive relief and those involving breaches of confidentiality. *See* RAM Defs.' Br. at 10–11; Pls.' Opp'n at 12–13. But the clause is "as broad as an arbitration provision as one can imagine," and since all of Plaintiffs' claims against the RAM

Defendants relate to the Agreement in some way, they are well within its scope. *Bell v. Cendant Corp.*, 293 F.3d 563, 568 (2d Cir. 2002); *see* Compl. ¶¶ 205–49; 256–86; 292–99. Accordingly, the parties must arbitrate the claims brought against the RAM Defendants.

**E. Both Plaintiffs Are Bound to Arbitrate**

The parties' final dispute regarding the arbitrability of the claims is whether Daneshvar, a nonsignatory to the RAM Engagement Agreement, is bound to arbitrate alongside his company, SD.[2] For the reasons that follow, the Court finds that he is.

Generally, "[n]onparties to a contract are . . . not bound by an arbitration agreement." *Benson v. Casa De Capri Enters., LLC*, 252 Ariz. 303, 306 (2022). There are, however, several "common law exceptions to this general rule," including estoppel, at issue here, which applies when a party is prevented from avoiding arbitration after receiving a benefit from an arbitration agreement. "Direct benefits estoppel specifies that a nonsignatory may be compelled to arbitrate only when the nonsignatory (1) knowingly exploits the benefits of an agreement containing an arbitration clause, or (2) seeks to enforce terms of that agreement or assert claims that must be determined by reference to the agreement." *Id.* (citing *Austin v. Austin*, 237 Ariz. 201, 208–09 (Ct. App. 2015)); *see also Apex Holdings LLC v. FairBridge Hotels Int'l Incorp.*, 2026 WL 1194784, at *3 (D. Ariz. May 1, 2026) (applying Arizona state law); *BakeMark USA LLC v. Negron*, 2025 WL 2845758, at *9 (S.D.N.Y. Sept. 29, 2025) (discussing circumstances in which a non-signatory directly benefits from an arbitration agreement executed by another, including where the non-signatory "su[es] as a third-party beneficiary of that agreement").

Although Daneshvar is not a signatory to the agreement, the RAM Defendants identify one

[2] "The Supreme Court has instructed that state law governs whether a non-signatory may enforce an arbitration clause." *Doe v. Trump Corp.*, 453 F. Supp. 3d 634,640 n.4 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)). The Court, thus, again applies Arizona state law.

critical benefit he received—namely the fact that he "has expressly pleaded his individual claims arising out of the contract." RAM Defs.' Br. at 12. They maintain that this is sufficient to compel him to arbitrate. The Court agrees. By bringing claims that expressly rely on the RAM Engagement Agreement as the source of the parties' obligations, Daneshvar has placed the Agreement at the center of his claims and seeks to enforce rights arising from that Agreement. The remainder of the claims brought by Plaintiffs must also be determined by reference to the Agreement and therefore also fall within its scope. *See* Compl. ¶¶ 205–26 (alleging violations of the Securities Exchange Act of 1934 in part based on "executing the EB-5 Investment Contract [a/k/a the RAM Engagement Agreement]"); *id.* ¶¶ 227–49 (alleging common law fraud, aiding and abetting fraud, and civil conspiracy to commit fraud against all Defendants, claiming that Defendants made numerous "misrepresentations of material facts to Plaintiffs" to secure their agreement and execution of the RAM Engagement Agreement); *id.* ¶¶ 256–76 (alleging conversion, civil conspiracy to commit conversion, and aiding and abetting conversion against all Defendants, resting in part on violations of the RAM Engagement Agreement); ¶¶ 292–99 (alleging breach of contract of the RAM Engagement Agreement). Accordingly, since Daneshvar has pursued these claims in his individual capacity, he is estopped from denying his obligation to arbitrate.[3]

## II. Motion to Stay

Since the Court has granted the RAM Defendants' motion to compel arbitration, it must

[3] Although Gross is not a signatory to the RAM Engagement Agreement, he is nevertheless entitled to arbitrate Plaintiffs' claims against him. Arizona courts have adopted the "alternative estoppel" theory to determine whether a non-signatory to an arbitration agreement can compel arbitration by a signatory. *Shivkov*, 2019 WL 8806260, at *13. A non-signatory may enforce an arbitration clause against a signatory when: "(1) the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided; or (2) each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, such that the signatory's claims arise out of and relate directly to the written agreement." *Id.* Here, the Court finds that Gross may also compel arbitration because Plaintiffs' claims against him arise out of and relate directly to the RAM Engagement Agreement. Nowhere in the Complaint did Plaintiffs bring a claim against RAM that it did not also bring against Gross. Accordingly, each of the claims against Gross "sufficiently arise out of and relate to the Agreement[] to allow for [him] to rely on the Arbitration clause through estoppel principles." *Shivkov*, 2019 WL 8806260, at *13.

also assess whether to stay the entire matter, including potentially non-arbitrable issues. In their opening brief, the RAM Defendants argued that the Court should stay this matter, *see* RAM Defs.' Br. at 13–14, and Plaintiffs do not appear to address this argument in their opposition. The Hicks Defendants, however, oppose the motion to stay, urging the Court to deny it since they are not signatories to the RAM Engagement Agreement or any arbitration agreement. Dkt. No. 47 ("Hicks Defs.' Opp'n") at 4. Although, the RAM Defendants do not seek to compel the Hicks Defendants to arbitrate, they nonetheless urge the Court to stay the case in its entirety in the interest of judicial efficiency. *See* Dkt. No. 51 ("RAM Defs.' Repl.") at 8–9. Given the overlap between arbitrable and non-arbitrable claims in this case, a stay of the entire matter pending the outcome of the arbitration is indeed warranted.

Within the Court's inherent power to manage its docket is the discretion to stay nonarbitrable claims in favor of a pending arbitration. *Donjon Marine Co., Inc. v. Water Quality Ins. Syndicate*, 523 F. App'x 738, 740 (2d Cir. 2013). "When other persons who are parties to the underlying dispute are not parties to the arbitration agreement," courts in this Circuit frequently find it "advisable to stay litigation among the nonarbitrating parties pending the outcome of arbitration." *Persaud v. Talent for 59th Street Bloomingdales*, 2026 WL 1097146, at *12 (E.D.N.Y. Apr. 23, 2026); *see also Marsh & McLennan Agency LLC v. Williams*, 2025 WL 1265817, at *14 (S.D.N.Y. Apr. 30, 2025) (staying plaintiff's claims against non-arbitrating defendant pending the outcome of arbitration against the remaining defendants).

The movant seeking a stay must show "there are issues common to the arbitration and the court proceeding and that those issues will be finally determined by arbitration." *GlobeNet Submarinos Am. Inc. v. FSF Tech. LTDA EPP*, 2019 WL 1437163, at *2 (S.D.N.Y. Mar. 29, 2019). "If this requirement is met, then the movant must show that "the non-arbitrating party will not

hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that such delay that may occur will not cause undue hardship to the non-moving parties." *Id.* Stays are seen as favorable "where they promote judicial economy, avoidance of confusion and possible inconsistent results." *Id.*

Here, a stay is warranted. Of the fifteen claims brought against Defendants, ten are brought against all Defendants. Many of those claims will be resolved in the arbitration between Plaintiffs and the RAM Defendants and overlap substantially with the claims remaining before this Court. Given the unity of factual and legal issues between the claims, the Court stays the entire matter pending the outcome of the arbitration with the RAM Defendants. There is no evidence that the RAM Defendants will hinder the arbitration or that the arbitration will not be resolved within a reasonable time. Accordingly, the RAM Defendants' motion to stay is granted.

## III. Motion to Transfer

In the alternative to arbitration, the RAM Defendants seek to transfer this case to the District of Arizona. *See* RAM Defs.' Br. at 14–15. Given that the Court has granted the motion to compel arbitration, it denies the RAM Defendants' motion to transfer venue, albeit without prejudice.

## IV. Default Judgment

As a final matter, Plaintiffs obtained a certificate of default as to Spedale, who has not filed a notice of appearance or otherwise responded in this matter. *See* Dkt. No. 65. They did not, however, move for default judgment as required by this Rule 4(F) of this Court's Individual Rules & Practices. In any event, given that the case is now stayed in its entirety pending the outcome of arbitration proceedings, the Court declines to proceed with the default judgment as to Spedale.

## CONCLUSION

For the reasons set forth above, the Court grants the RAM Defendants' motion to compel arbitration as to all claims brought by Plaintiffs against them and stays the entirety of the case pending the outcome of arbitration. The RAM Defendants shall file a status report concerning the progress of arbitration ninety (90) days from the issuance of this order, and every ninety (90) days thereafter. The parties shall promptly and jointly file notice on the docket when arbitration is complete and propose next steps in this action.

SO ORDERED.

Dated: August 6, 2026
New York, New York

Ronnie Abrams
United States District Judge